IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARRIAN DANIELS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:21-CV-529-MAB |
| | ) |
| JOSHUA SCHOENBECK, | ) |
| CURTIS DALLAS, ANTHONY JONES, | ) |
| EDWIN GLADNEY, and | ) |
| ANTHONY WILLS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on Plaintiff Darrian Daniels' motion for preliminary injunction (Doc. 4). For the reasons explained below, the motion is denied.

### BACKGROUND

This lawsuit is a pared down version of one that Plaintiff Darrian Daniels previously filed in this District and then voluntarily dismissed. In the previous case, which was filed in January 2021, Plaintiff claimed that he was charged and disciplined unjustly, resulting in placement in segregation in the North 2 cellhouse at Menard Correctional Center, where conditions were deplorable and he was denied appropriate accommodations for his alleged hearing loss. SDIL Case No. 21-cv-51-NJR, Docs. 1, 6. He was permitted to proceed on an Eighth Amendment claim for unconstitutional conditions of confinement and three due process claims regarding his disciplinary convictions. *Id.* at

Doc. 6.[1] Plaintiff sought preliminary injunctive relief, asking the Court to issue an order requiring Menard officials to remove him from the North 2 cellhouse and place him in housing that can accommodate his alleged ADA disability of deafness. *Id.* at Doc. 4. Following a hearing, Chief District Judge Nancy Rosenstengel denied Plaintiff's motion for preliminary injunction. *Id.* at Doc. 36. Specifically, Judge Rosenstengel concluded that Plaintiff did not have a reasonable likelihood of success on the merits of his claim regarding the conditions of his confinement because his testimony regarding his hearing loss and the physical issues he was allegedly suffering in segregation (headaches, musculoskeletal pain, depression, etc.) was not credible and additional evidence showed that he was offered opportunities to leave his cell on a regular basis but refused to do so. *Id.* Plaintiff then filed a motion criticizing Judge Rosenstengel's ruling but ultimately asking to dismiss his case. *Id.* at Doc. 37. His motion was granted and the case was dismissed without prejudice on May 21, 2021. *Id.* at Docs. 39, 40.

Eleven days later, on June 1, 2021, Plaintiff filed the instant case (Doc. 1). Plaintiff once again claims that he was falsely charged with disciplinary infractions and unjustly punished with placement in segregation in Menard's North II Cell area, where the conditions of confinement are deplorable (Doc. 1). Eight days after he filed his complaint, Plaintiff filed a Motion for Temporary Restraining Order and/or Injunction Relief Request, asking the Court to issue an order requiring Menard officials to remove him from segregation in the North II cellhouse and house him around non-mentally ill

---

[1] The Court takes judicial notice that Plaintiff also has a pending case in this District regarding medical treatment for his hearing, *Daniels v Lawrence*, SDIL Case No. 20-cv-96-DWD.

inmates (Doc. 4). District Judge David W. Dugan determined that a temporary restraining order ("TRO") was not warranted but left Plaintiff's request for a preliminary injunction pending (Doc. 5). Judge Dugan then screened the complaint pursuant to 28 U.S.C. § 1915A, allowing Plaintiff to proceed only on a Fourteenth Amendment due process claim against Joshua Schoenbeck, Curtis Dallas, Anthony Jones, and Edwin Gladney in connection with Plaintiff's disciplinary convictions (Count 1) (Doc. 6).[2] The Warden of Menard was added as a Defendant, in his official capacity only, and ordered to respond to Plaintiff's motion for preliminary injunction (Doc. 6). The parties then consented to have a United States Magistrate Judge conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, and the case was transferred to the undersigned in July 2021 (Doc. 27). A hearing on Plaintiff's motion for preliminary injunction was held on August 23, 2021 (Doc. 46).

## FACTUAL BACKGROUND[3]

Plaintiff was housed in segregation in North II, and when it was time for him to be released in October 2019, officers came to his cell and told him to pack his stuff to move to the East cell house (*see* Doc. 1, p. 17). But Plaintiff refused to leave segregation and go to the East cell house (Doc. 1, p. 11). He was then given a disciplinary ticket for disobeying a direct order essential to safety and security (DR 215) (Doc. 1, p. 9). A hearing on the

---

[2] Notably, Plaintiff was not permitted to proceed on an Eighth Amendment claim about the conditions of confinement.

[3] This information is taken from the complaint (Doc. 1), Plaintiff's motion for preliminary injunction (Doc. 4), Defendant's response in opposition and supporting documentation (Docs. 28, \_\_\_\_), Plaintiff's reply (Doc. 35), and the testimony offered during the motion hearing.

ticket was held before the Adjustment Committee on October 15th (Doc. 1, p. 17). As Plaintiff tells it, Joshua Schoenbeck, Anthony Jones, Edwin Gladney, and Curtis Dallas, who he says are all "Chair-person" of the Adjustment Committee, did not allow him to attend the hearing on the ticket and falsely indicated that he refused to attend (Doc. 1, pp. 9, 17). There is a "Refusal Form" for this hearing, but it was only partially filled out (Doc. 47, p. 3). It indicates that Plaintiff was informed of the hearing but the section of the form where it states "I am aware that I have the right to appear . . . . However, I voluntarily choose not to do so . . . ." is blank; Plaintiff did not sign it nor is there an indication that he refused to sign (*see id.*). At the hearing, Plaintiff was given three months segregation time as punishment (*see* Doc. 1, p. 17).

According to Plaintiff, this same scenario continued to repeat and he remains in segregation to this day (Doc. 1, pp. 9, 21, 27, 32, 34; Doc. 35, pp. 2–3; Doc. 48). The evidence before the Court indicates that Plaintiff received another ticket on January 9, 2020 for refusing to leave segregation (*see* Doc. 1, p. 21), although neither the ticket nor the Adjustment Committee summary is part of the record. There is a Refusal Form that indicates the Adjustment Committee hearing was held on January 14th, and that Plaintiff was told about the hearing but voluntarily chose not to attend, and he also refused to sign the Refusal Form (Doc. 47, p. 4). The Court presumes that Plaintiff received three months segregation time as punishment because he once again received a ticket three months later on April 9, 2020 for refusing to leave segregation (Doc. 1, pp. 21–22). Again, there is a Refusal Form indicating that Plaintiff voluntarily chose not to attend the Adjustment Committee hearing on April 15th and also refused to sign the form (Doc. 38, p. 6). He was

given another three months in segregation, or until approximately July 9th (Doc. 1, pp. 21–22).

The parties do not dispute that Plaintiff remained in segregation after July 9th until he received another ticket for refusing to leave segregation on February 5, 2021 (Doc. 1, p. 27).[4] A Refusal Form indicates that he chose not to attend the Adjustment Committee hearing on February 9th and also refused to sign the form (Doc. 47, p. 10). He was given 29 days in segregation as punishment (Doc. 1, p. 27). The evidence shows this same scenario occurred again in March and April 2021 (Doc. 1, pp. 32–33, 34–35; Doc. 45, pp. 2, 3; Doc. 47, pp. 11, 13). It also appears to have continued in May (Doc. 45, p. 3; Doc. 47, p. 14), June (Doc. 45, p. 4), July (Doc. 45, p. 5), and August 2021 (Doc. 45, p. 6).[5] Plaintiff contends that as of September 23, 2021, he was still in segregation in North II (Doc. 48).

Plaintiff says that he refused to move to the East Cell House because it is "known to be Menard's most dangerous cell house" (Doc. 4, pp. 4–5). He claims that all prisoners housed there are mentally ill, STG members, weapon violators, highly aggressive, etc. (Doc. 4, p. 5). He testified that the East Cell House was "overflow" from Chester Mental

---

[4] It is not clear why Plaintiff was held in segregation from July 9, 2020 to February 5, 2021. It appears likely that it was due to other tickets that he received, although the Court does not know the reasons those tickets were issued because they are not in the record, nor are the summaries from the Adjustment Committee hearings on the tickets. Specifically, there is evidence that Plaintiff received two more tickets on April 19, 2020 (*see* Doc. 1, pp. 27, 32) and there was an Adjustment Committee hearing on April 28th presumably related to these two tickets (Doc. 47, p. 7). There is a Refusal Form that indicates Plaintiff refused to attend this hearing (*Id.*). There are also Refusal Forms that indicate Plaintiff refused to attend Adjustment Committee hearings held on September 15, 2020 and December 29, 2020 (Doc. 47, pp. 8-9).

[5] The Court has evidence that Plaintiff received tickets for refusing to leave segregation in May, June, July, and August 2021 (Doc. 45, pp. 3–6), and that Plaintiff refused to attend the Adjustment Committee Hearing on the May ticket (Doc. 47, p. 14). However, there is no evidence regarding the punishment that Plaintiff received on these tickets. The Court presumes that he received additional segregation time given that is where he remained housed the entire time.

Health. He contends that since he has no history of mental illness or aggressive behavior, he "should not by law be forced to be housed around these types of inmates" (Doc. 4, p. 5). He is concerned that his life will be in danger in the East Cell House (*e.g., id.* at pp. 3–5).

Plaintiff alleges that staying in segregation is an equally horrible option because conditions in the North II segregation unit are deplorable. He says the segregation cells are tiny and lack proper ventilation (Doc. 1, p. 2). He also claims he is confined to his cell for 24 hours a day and deprived of meaningful social interaction and physical or mental activity, including education programs (Doc. 4, p. 2). He testified that is because he is completely deaf in his right ear and almost fully deaf in his left ear, so he cannot hear officers through the steel door of his segregation cell when they ask the inmates if they want to go to yard, to showers, etc. (*see also* Doc. 1, p. 12). Plaintiff further testified that he has not been to yard the entire time he has been at Menard because he cannot hear the officers announce that it is time to go to yard. He further testified that he has never refused to go to yard at Menard. He likewise testified that he has never refused a shower. Notably, there is no evidence in the record regarding how correctional officers call inmates to go to yard or the showers. For example, do they stand at the end of the gallery and yell out to the inmates? Do they go door-to-door? All Plaintiff said was "aint nobody trying to get my attention" to go to yard or showers, and "when they want to get my attention, they bang on the wall." Plaintiff also testified that he did not know when they "run" yard or showers, even though he had been housed at Menard in segregation for over three years.

Plaintiff claims that as a result of his time in segregation, he has developed musculoskeletal pain, tension, depression, severe headaches, and nose bleeds (Doc. 1, pp. 11–12). He testified that prison officials refuse him medical care and will not send him to the health care unit. He said the only thing he was sent to health care for was a hearing test.

In response, Defendant provided medical and mental health records revealing that Plaintiff has not been complaining about or seeking treatment for his alleged physical and mental health conditions. For example, records from December 2020 through May 2021 show that a nurse conducted rounds in segregation nearly every day and a doctor did rounds several times a month, and their logs show that Plaintiff never had any complaints (Doc. 28-2, pp. 1–7, 9–16; *see also* Doc. 28-1). Defendants also submitted medical records and an affidavit from Angela Crain, the Health Care Unit Administrator at Menard, regarding Plaintiff's purported hearing loss. Specifically, a hearing test performed by a specialist in January 2021 showed that Plaintiff had "normal to mild hearing loss" and no follow up was recommended (Doc. 28-1; Doc. 28-3). A note from the medical director that same month says that Plaintiff had "functional [hearing loss]" and no follow-up was planned (Doc. 28-1; Doc. 28-3).

Defendant also contends that Plaintiff's housing options are limited because he has been refusing to be tested for tuberculosis ("TB") for years (Doc. 28). Angela Crain stated in her declaration that Plaintiff cannot be transferred to general population without passing a TB test (Doc. 28-1), which according to Major Rowland, is because prison officials want to keep the offender behind a solid door. The medical records show that

Plaintiff repeatedly refused to take a tuberculosis ("TB") test, refused to be seen by medical providers regarding a TB test, and refused to sign the "Medical Services Refusal" forms (Doc. 28-2, pp. 9–16, 18–29). Angela Crain's explanation, however, conflicts with the evidence that prison officials have been trying to move Plaintiff to the East cell house for two years, which according to both Terri Wingerter[6] and Major Rowland *is* general population (Doc. 28-5, Doc. 28-4). When asked about this discrepancy at the hearing, Major Rowland responded, "I guess the medical staff can clear him to go." Plaintiff argued at the hearing that all of the medical records, including the records regarding a TB test, were falsified.

Defendant also provided a declaration from Major Trevor Rowland, who is the Major assigned to the restrictive housing unit in the North 2 Cell House, regarding the cell conditions in North 2 and opportunities afforded to Plaintiff to leave his cell (Doc. 28-4). Major Rowland also testified at the evidentiary hearing. He stated that per prison policy, inmates in segregation are given the opportunity to go to yard five times a week for two hours a day and that the two hours each day is separated into one-hour blocks (Doc. 28-4). They are provided with ten (10) hours of group time with mental health providers each week, three (3) showers per week, and weekly hygiene items as well as cleaning supplies for their cells three (3) times a week on Tuesday, Thursday and Saturdays (Doc. 28-4).

---

[6] Ms. Wingerter has been the Placement Supervisor at Menard Correctional Center since 2014 (Doc. 28-5). Defendant submitted a Declaration from her with his response to Plaintiff's motion for preliminary injunction (Doc. 28-5).

Privilege Logs kept by the officers working in segregation for April 2021 through the first half of August 2021 show that showers were almost always offered three times a week, like Major Rowland claimed (Doc. 45-2). The Logs also show that Plaintiff refused showers every time they were offered except for one time on June 18, 2021 (*Id.* at p. 13).

As for yard time, the Logs show it was not offered anywhere close to what Major Rowland said (*see* Doc. 45-2). According to the logs, yard time was "not scheduled" in April 2021, aside from one instance on the 26th during the 7am to 3pm shift (Doc. 45-2, pp. 1–5). It was "not scheduled" the first two weeks of May 2021, but it was offered three or four times a week for the remainder of the month (*Id.* at pp. 5–7). It was offered eleven times in June and four times during the first week of July (*Id.* pp. 10–16). However, it was "not scheduled" for the remainder of July or the first week of August (*Id.* at pp. 16–21). The second week of August, yard was offered three times (*Id.* at p. 22). Regardless of the frequency with which it was offered, the Logs show that Plaintiff refused to attend every time yard was offered except for one time on June 17th (*Id.* at p. 13).

The Logs also show that Plaintiff accepted meals every day; in fact, it appears that he never refused one (Doc. 45-2, pp. 10–31). And he always accepted mail, phone, laundry, commissary, hygiene items, and cleaning items when they were offered (Doc. 45-2, pp. 10–31). The Logs also show that a mental health provider and a counselor made rounds through segregation and talked to Plaintiff nearly every week from April through the first half of August 2021 (*see* Doc. 45-2). An "Education" staff member made rounds through segregation and talked to Plaintiff nearly every week in April and May, twice in June, once in July, and once during the first half of August (*Id.*). And a law clerk from the

library saw Plaintiff twice in April and once in May (*Id.*). Major Rowland testified that these all would have been face-to-face interactions. Plaintiff argued at the hearing that all of the Privilege Logs were falsified.

## **LEGAL STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). *Accord Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 965 (7th Cir. 2018) ("[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (citations omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)).

In the context of prisoner litigation, the scope of the court's authority to enter an injunction is circumscribed by the Prison Litigation Reform Act ("PLRA"). *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). The PLRA instructs the court to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief" and dictates that any preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2); *see also Westefer*, 682 F.3d at 683. The Seventh Circuit has

described injunctions like the one sought here, requiring an affirmative act by the defendant, as a mandatory preliminary injunction. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Mandatory injunctions are "cautiously viewed and sparingly issued," because they require the court to command a defendant to take a particular action. *Id.* (citing *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)).

## DISCUSSION

Plaintiff has not met the significant burden to obtain a preliminary injunction because he has not shown a reasonable likelihood of success on the merits of his claim. "A movant's showing of likelihood of success on the merits must be 'strong.'" *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2798 (2021) (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020)). "A 'strong' showing . . . does not mean proof by a preponderance . . . . But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Tully*, 977 F.3d at 613.

As an initial matter, the Court notes that Plaintiff repeatedly talked about the "falsified disciplinary reports" he received for disobeying a direct order. However, there is nothing that suggests these tickets were based on fabricated situations or contained untrue accusations. In fact, Plaintiff readily admitted that he has continuously refused to leave segregation and move to the East cell house. The issue is whether the procedures Plaintiff was afforded in connection with each of his hearings before the Adjustment Committee on the disciplinary tickets were deficient. Plaintiff has not made a strong showing that they were. *See Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019) ("When an

inmate raises a due process claim for a disciplinary proceeding, he must demonstrate: (1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient.") (citation omitted).

Plaintiff says he was not allowed to attend any of the disciplinary hearings. However, the documentary evidence shows that Plaintiff was informed of each and every hearing but voluntarily chose not to attend and also declined to sign the Refusal Forms acknowledging as much. Plaintiff claims those Refusal Forms were falsified, along with nearly every other record in this case. However, his bald assertions are simply not credible. To begin with, Plaintiff's refusal to attend disciplinary hearings or to sign the Refusal Forms would be consistent with other records in this matter that show Plaintiff routinely refused other opportunities to leave his cell to go to yard and the showers. He also refused medical services on a number of occasions and also refused to sign the "Medical Services Refusal" forms. These various records and forms were filled out by a number of different correctional officers, medical personnel, and other prison staff (*see* Doc. 47, Doc. 28-2). Plaintiff would have the Court believe there is a swath of officers willing to fabricate Refusal Forms, in blatant disregard for the prison procedures and constitutional requirements, every single time Plaintiff had a disciplinary hearing over the course of two years. And that officers, mental health providers, counselors, educators, and law clerks repeatedly and routinely falsified Privilege Logs on a weekly, if not daily basis, over the course of many months. And that medical providers likewise falsified their charts, logs, notes, and forms on a daily basis, over the course of many months. None of it rings true. It is simply not plausible, based on Plaintiff's bare assertions alone, that there

is some vast conspiracy amongst prison staff of every sort to fabricate all manner of Plaintiff's records.

Plaintiff also has not demonstrated that he will *likely* suffer irreparable harm without a preliminary injunction. "This requires 'more than a mere possibility of harm.'" *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (citations omitted). Plaintiff testified that he has frequent nosebleeds, really bad headaches, muscle aches, and bone aches, which he attributes to being confined to his cell in segregation for 24 hours a day because he cannot hear correctional officers ask him if he wants to leave his cell. His testimony, however, is not enough to make a strong showing of likely irreparable harm for a couple of reasons. First, the medical records indicate that Plaintiff does have hearing loss to the degree he claims. He says he is completely deaf in his right ear and nearly deaf in his left ear. But the audiologist at St. Louis University who assessed Plaintiff's hearing said the tests showed only normal to mild hearing loss. Furthermore, the records show that while he refused to go to yard and the showers, he has always accepted his meals, mail, phone, laundry, commissary, hygiene items, and cleaning items. Plaintiff did not explain whether there was any difference in how these things were offered versus how yard and showers were offered, or how he was able to know about and accept these things but not yard and showers. Second, there is no indication in the medical records produced to the Court that Plaintiff has ever complained about his purported issues to any medical professional. He testified very generally that he has submitted request slips asking for medical care and grievances about the lack of medical care, but he did not submit any of them to the Court. His very brief, unadorned testimony about his aches

and pains is not enough to convince the Court that irreparable harm is likely without a preliminary injunction.

Plaintiff also has not made a strong showing that he will suffer irreparable harm if he follows orders to move to the East cell house. He testified that he has never been housed in the East cell house at Menard, and everything he knows about it is based on what he hears from other inmates. He did not, however, identify any of these inmates or describe with any specificity what he has purportedly been told about the East cell house. His safety concerns regarding the East cell house are purely speculative and thus not enough to make the requisite showing of irreparable harm. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

After considering the parties' briefing and the relevant testimony, the Court finds that Plaintiff has failed to establish a reasonable likelihood of success on the merits or that he will suffer irreparable harm absent preliminary injunctive relief. Consequently, his motion for preliminary injunction (Doc. 4) is **DENIED.**

**IT IS SO ORDERED.**

**DATED: October 14, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**