IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DARRIAN DANIELS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 3:21-CV-529-MAB |
| | ) |
| **JOSHUA SCHOENBECK,** | ) |
| **ANTHONY JONES,** | ) |
| **EDWIN GLADNEY, CURTIS DALLAS,** | ) |
| **and ANTHONY WILLS,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment on the issue of exhaustion filed by Defendants Joshua Schoenbeck, Anthony Jones, Edwin Gladney, and Curtis Dallas (Docs. 58, 59) and Anthony Wills (Docs. 73, 74). For the reasons explained below, the motions are granted.

### BACKGROUND

In June 2021, Plaintiff Darrian Daniels, an inmate in the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 for purported deprivations of his constitutional rights at Menard Correctional Center (Doc. 1, Doc. 6). He was later permitted to file an amended complaint (Docs. 67, 68). Plaintiff makes the following allegations that are relevant to the issue of exhaustion (Docs. 1, 68; *see also* Docs. 6, 52, 67). Plaintiff was housed in segregation in the North II cellhouse at Menard. When

his time in segregation was up in October 2019, he was told to move to the East cell house, but he refused to leave segregation because he was afraid that he would be celled with a mentally ill inmate and his life would be in danger. Because Plaintiff refused to move, he was given a disciplinary ticket for disobeying a direct order essential to safety and security and punished with more time in segregation. This same cycle—Plaintiff refusing to move to the East cell house, getting ticketed for his refusal, and being punished with more time in segregation—continued to repeat over and over. Plaintiff alleges that he was given at least 12 disciplinary tickets between October 2019 and September 2021 (Doc. 68, p. 4), and as a result, he was continuously housed in segregation for close to three years for refusing to move to the East cell house.[1] Plaintiff claims that he was not allowed to attend any of the hearings on the tickets he received. He also claims that he should have been charged with a lesser offense that did not carry segregation as a possible punishment. And he claims that the conditions of confinement in segregation were deplorable.

Plaintiff is currently proceeding on the following counts:

**Count 1:** Fourteenth Amendment due process claim against Joshua Schoenbeck, Curtis Dallas, Anthony Jones, and Edwin Gladney in connection with his disciplinary convictions (Doc. 6); and

**Count 2**: Eighth Amendment claim against Warden Anthony Wills regarding the conditions of confinement in North II segregation (Doc. 67; Doc. 68).

---

[1] Plaintiff testified at the hearing that six-months of his time in segregation was for a different offense, namely that he failed to "cuff up" when ordered by an officer. The rest of the time in segregation was presumably due to all the occasions on which he refused to move to the East cell house. Plaintiff stated in a recent filing that his stint in segregation ended on May 26, 2022, when he finally complied with orders to move to the East cell house (Doc. 82).

Defendants Dallas, Gladney, Jones, and Schoenbeck filed their motion for summary judgment on the issue of exhaustion on December 13, 2021 (Docs. 58, 59). Defendant Wills then filed his motion for summary judgment on the issue of exhaustion on April 7, 2022 (Docs. 73, 74). Plaintiff filed responses in opposition to both motions (Doc. 63, Doc. 77). None of the Defendants filed a reply brief. Defendants argue, in short, that Plaintiff did not file or fully exhaust any grievances related to his claims in this case. Plaintiff contends, however, that he was thwarted from using the grievance process.

An evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), was held on August 25, 2022 (Doc. 93). Three witnesses testified at the hearing: Kelly Pierce—who is a grievance officer at Menard, Travis Bayler—who is employed by the ARB, and Plaintiff.

## FACTS

Kelly Pierce testified that inmates are made aware of the grievance process in multiple ways. First and foremost, the grievance procedures are included in the orientation manual that every inmate receives. At the hearing, Plaintiff testified that no such manual exists. However, his cumulative counseling summary indicates he received a copy of that manual as recently as March 8, 2018 (Doc. 59-2, p. 12). Ms. Pierce testified that the orientation manual is also available in the law library, and the offender television channel runs a bulletin regarding the grievance process and any updates to the process. At any rate, Plaintiff testified unequivocally that he knew the grievance process.

Both Kelly Pierce and Travis Bayler testified that grievances must be submitted on

the proper form. Ms. Pierce said that if a grievance is submitted on notebook paper, it is returned to the inmate with a note stating that the grievance was not accepted and advising the prisoner to use the proper form. She testified that the grievance forms are available in each of the cell houses. The cell house officers are supposed to monitor the grievance form and refill the supply when necessary. If inmates are having trouble obtaining a grievance form, they can send a kite to the grievance office or their counselor. The grievance office or counselor would then contact the cell house to ensure grievance forms were available and/or prompt the officers to replenish the supply.

Kelly Pierce testified that as of 2019, inmates in segregation submitted their grievances by placing them directly in a portable, locked grievance box in the cell house. She said it was mandatory for inmates to submit their grievances in this manner. Plaintiff disputed that the grievance box was in use during the entire time period at issue, but his testimony wavered as to when the grievance box was implemented. According to him, "the grievance box just started. They ain't start doing the grievance box until 2021. That's a new process. I'mma say 2020. That's a new process. . . . . I ain't start trying to even drop a grievance in the grievance box until 2020, end of 2020." He said before the grievance box was in use, he would submit grievances by placing them in the door of his cell and they would be picked up by correctional officers at mail time.

Ms. Pierce further testified that correctional staff bring the grievance box to the grievance office every day to be emptied. Only grievance officers or counselors can unlock the grievance box. The grievance office logs each grievance and sends a receipt to the inmate to let them know their grievance was received. Travis Bayler likewise testified

that the ARB logs every grievance that it receives, even the ones that are returned without being addressed because they are procedurally deficient (*e.g.*, missing signatures from the facility, out of time, etc.).[2]

Plaintiff testified generally that every time he received a disciplinary ticket, he submitted a grievance written on a grievance form (s*ee also* Doc. 63, pp. 2–3; Doc. 77, p. 2). And when he did not receive a response to the first grievance, he would send a second, follow-up grievance written on a piece of paper. In other words, he submitted two grievances for every ticket he received. Plaintiff stated in his briefing that the wardens at Menard refused to respond to all of his emergency grievances (Doc. 63, p. 3). And he testified that he never received a single grievance back from the grievance officer or from the ARB. Plaintiff also argued in his response briefs and testified at the hearing that the ARBs records are falsified.

---

[2] Plaintiff claimed at the hearing that Bayler's testimony was inconsistent with an affidavit that Bayler had previously submitted in a different case. According to Plaintiff, Bayler previously stated that the ARB "do[es] not log grievances . . . that you don't exhaust at the prison." Plaintiff did not have the affidavit with him nor was it readily available at the prison; he said it was in storage. He told the Court that the affidavit was submitted in either *Daniels v. Prentice* (CDIL case #16-cv-1245-JES) or *Daniels v. Pfister* (CDIL case #14-cv-1456-MMM). The Court located both cases and neither contained an affidavit along the lines of what Plaintiff claimed. In *Pfister*, there was no motion for summary judgment on the issue of exhaustion. *See Daniels v. Pfister*, CDIL case #14-cv-1456-MMM. In *Prentice*, Dave White, not Travis Bayler, submitted an affidavit on the ARB's behalf. *Daniels v. Prentice*, CDIL case #16-cv-1245-JES, Doc. 27-1. Mr. White stated, "If the inmate has not followed procedure, and for example, has not first attempted to resolve the issue through his counselor or grievance officer, then the original grievance is returned to him along with a form describing the procedural deficiency." *Id.* Nowhere did he say that the ARB does *not log* receipt of procedurally deficient grievances. *See id. See also Daniels v. Hubert*, CDIL case #15-cv-1085-JES, Doc. 18-6 (affidavit of Billie Greer stating, "The ARB maintains a log of the grievances an inmate files called 'IGRV Inmate History' . . . [which] indicates the dates, locations, and a brief description of *all* grievances filed with the ARB.") (emphasis added); *Daniels v. Lawrence*, SDIL Case #20-cv-96-DWD, Doc. 101, pp. 14–18 (affidavit of Travis Bayler stating, "The ARB maintains a log, known as IGRV, which shows *all* grievances received by the ARB for a particular individual in custody.") (emphasis added). The Court also notes that Plaintiff's IGRV history demonstrates that the ARB does in fact log receipt of procedurally deficient grievances as evidenced by the fact that Plaintiff's grievances dated October 30, 2019 and January 1, 2020 were both logged (*see* Doc. 74-2, p. 10).

Defendants claim there are three grievances in the ARB records from the time period at issue between October 2019 — when Plaintiff received his first ticket for refusing to move, and June 1, 2021 — when Plaintiff filed his complaint to initiate this lawsuit (Doc. 59, p. 2; Doc. 74, p. 3). The first is an emergency grievance (#377-10-19) dated October 30, 2019 (Doc. 74-2, pp. 5–9), which is shortly after Plaintiff received his first ticket for refusing to move to the East cell house. Plaintiff marked on the grievance that it pertained to a disciplinary ticket. In the body of the grievance he mentioned a host of other issues, including in pertinent part, that he received falsified disciplinary reports, was placed in "condemn" cells, was refused food, yard, shower, and legal calls, and had been forced to live in segregation "to this date." He said his situation was long-standing and well-documented. He asked for a transfer and compensation for every day that he was forced to live in segregation. The grievance was deemed a non-emergency by the warden on November 1, 2019 (Doc. 74-2, p. 6; Doc. 59-2, p. 8). It was received by the ARB on November 14th (Doc. 74-2, p. 5; *see also id.* at pp. 6–9). The ARB responded on November 19th that the grievance was being returned because it was "[n]ot submitted in the timeframe outlined in Department Rule 504" as "no dates given are within time frame to file a grievance" (Doc. 74-2, p. 5; *see also* Doc. 63, p. 21).

Plaintiff claimed in his response briefs and testified at the hearing that after the grievance was deemed a non-emergency, he tried to resubmit it to the grievance officer, but the grievance officer brought it back to him and said the warden had already ruled on the grievance and he needed to send it to the ARB if he wanted to appeal the warden's decision (Doc. 63, pp. 4, 5). Plaintiff said he did as he was instructed and sent it to the

ARB but never received the ARB's response.

The second grievance discussed by Defendants is Plaintiff's emergency grievance (#327-1-20) dated January 21, 2020 (Doc. 74-2, pp. 2–4). In this grievance, Plaintiff complained about a ticket he received that month and the corresponding hearing. The grievance was deemed a non-emergency by the warden on January 28th and returned to Plaintiff on January 29th (Doc. 59-1, p. 3; Doc. 59-2, p. 7; Doc. 59-3). The grievance is stamped as received by the ARB on April 7, 2020 (Doc. 59-1, p. 2; *see also id.* at pp. 3, 4). It was returned without being addressed because it was "[n]ot submitted in the timeframe outlined in Department Rule 504" (*Id.* at p. 2; *see also* Doc. 63, p. 22).

Plaintiff once again claimed that he tried to resubmit this grievance through the normal grievance process after it was deemed a non-emergency. But the grievance officer brought it back to him and told him that the warden had already ruled on it and if he wanted to appeal the warden's decision, he had to send it to the ARB (Doc. 63, p. 5). Plaintiff said because he had "found out that this remedy was a falsehood," he resubmitted the grievance to the counselor. He says it was again brought back to him and he was told to send it to the ARB, so he did. Plaintiff claims he has not received the grievance back from the ARB.

The third grievance discussed by Defendants is Plaintiff's emergency grievance (#33-5-201) dated April 19, 2020 (Doc. 74-2, pp. 11–15; *see also* Doc. 59-2, p. 6; Doc. 59-3). In this grievance, Plaintiff complains about being maced by the tactical team, his confiscated property, the warden's refusal to train staff on how to handle inmates with hearing loss, and the ADA coordinator's refusal to provide Plaintiff with

accommodations for his hearing loss (*see* Doc. 74-2, pp. 11–15). According to the cumulative counseling summary, the grievance was deemed a non-emergency but rather than being returned to Plaintiff, it was sent directly to the ADA coordinator to review and then the grievance officer (Doc. 59-6, p. 6; *see also* Doc. 59-3).[3] Kelly Pierce was the grievance officer who reviewed the grievance on May 5, 2020 and recommended that it be deemed moot (Doc. 74-2, p. 12). The warden concurred on May 20, 2020 (*Id.*). The grievance was returned to Plaintiff on May 21st (Doc. 59-3). That same day, Plaintiff signed the section of the grievance indicating he was appealing to the ARB (*Id.*). The ARB received the grievance on May 28th (*see id.* at pp. 11–15). Plaintiff submitted copies of two letters—one dated June 12th and the other dated June 22nd—that he purportedly sent to the ARB asking for a response to his grievance (Doc. 63, pp. 13, 14). The ARB took over a year to provide Plaintiff with a response—the grievance was denied on August 19, 2021 (Doc. 74-2, p. 11).

The Court also notes there is other grievance-related activity reflected in the records submitted by the parties during the course of this litigation, including documents attached to the original complaint (Doc. 1). Some of the activity appears to be directly related to the incidents at issue in this lawsuit while some of it does not, but this information is nevertheless useful because it sheds light on Plaintiff's experience with the grievance process in general.

---

[3] Kelly Pierce testified that grievances concerning ADA accommodations are expedited to a second level review with the grievance officer, and review by the counselor is skipped.

First, the cumulative counseling summary indicates the grievance office received three emergency grievances in addition to the three already described. On November 26, 2019, the grievance office received an emergency grievance (#279-11-19) dated November 22, 2019 "regarding deliberate indifference/inhumane living conditions, inadequate medical and mental health treatment" (Doc. 59-2, p. 8). Neither party provided a copy of this grievance, nor did Plaintiff testify about its contents. This grievance was apparently deemed a non-emergency and returned to Plaintiff on November 27th (*Id.*). There is no evidence in the prison's records that it went any further (*see id.*). However, Plaintiff submitted a copy of a letter dated June 22, 2020 that he sent to the ARB asking for a response to this grievance (Doc. 63, p. 14). Plaintiff stated he had been writing to the ARB since December 2019 looking for this grievance (*Id.*). But there is no indication in the ARB's records that this grievance was ever received (*see* Doc. 74-2, pp. 1, 10).

On May 8, 2020, the grievance office received an emergency grievance (#64-5-20) dated April 29th regarding a disciplinary ticket (Doc. 59-2, p. 6; Doc. 59-3). Neither party submitted an actual copy of this grievance or directly addressed it. A receipt of the grievance was made and sent to Plaintiff on May 8th (Doc. 59-3). The grievance was deemed non-emergency and returned to Plaintiff on May 12, 2020 (Doc. 59-2, p. 6; Doc. 59-3). There is no evidence in the prison's records that Plaintiff resubmitted the grievance through the normal procedure (*see* Doc. 59-2, p. 6; Doc. 59-3).

On May 26, 2020, the grievance office received an emergency grievance (#189-5-20) dated that same day regarding ADA accommodations (Doc. 59-2, p. 6; Doc. 59-3). The warden deemed it a non-emergency but sent it to the ADA coordinator to review (Doc.

59-2, p. 6). The grievance officer then reviewed the grievance on May 28, 2020 and the warden signed off on it on June 2nd (Doc. 59-3). The grievance was returned to Plaintiff on June 3rd (Doc. 59-3). There is no indication in the records that Plaintiff appealed this grievance to the ARB (*see* Docs. 59, 63, 74, 77).

Additionally, the cumulative counseling summary indicates there were two instances where the grievance office received grievances from Plaintiff that were not on a grievance form. The first was received on April 6, 2020 (Doc. 59-2, p. 7). A memo was sent to Plaintiff instructing him to use a grievance form (*Id.*). Additionally, the cell house was contacted and advised that there were grievance forms available on the gallery (*Id.*). The second was received on February 17, 2021 (Doc. 59-2, p. 3). It was returned to Plaintiff, and he was told to resubmit the grievance on the proper form (*Id.*). There is no evidence regarding the content of these grievances/kites.

Plaintiff similarly submitted to the Court copies of "grievances" that were not on proper grievance forms. The first was dated November 15, 2019 and complained about the ticket he received in October and the corresponding hearing (Doc. 1, pp. 17–20). The second was dated May 2, 2020 and complained about the ticket he received in April 2020 and the corresponding hearing (Doc. 1, pp. 21–26). The third was dated February 25, 2021 and complained about a ticket he received that same month and the corresponding hearing (Doc. 1, pp. 27–31). There is no evidence as to what transpired with these "grievances."

The Court notes that Plaintiff received additional tickets for refusing to leave segregation in March, April, and May 2021 (Doc. 1, pp. 32–33; Doc. 68, p. 4). There are no

documents from either party that indicate or even suggest that Plaintiff filed grievances related to these tickets (*see* Docs. 59, 63, 74, 77).

## LEGAL STANDARDS

*Summary Judgment*

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In making that determination, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *E.g., Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, when the motion for summary judgment pertains to a prisoner's failure to exhaust, the Seventh Circuit has instructed courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a prisoner's efforts to exhaust. *Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015) (citing *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008)). *Accord Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014).

*Exhaustion*

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative

remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey*, 663 F.3d at 903 (citations omitted).

As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code to exhaust his claims. 20 ILL. ADMIN. CODE § 504.800, *et seq.* (2017). The normal grievance process involves three steps. First, the offender must submit a grievance to their counselor within 60 days of the incident, occurrence, or problem. *Id.* at § 504.810(a).[4] After the counselor responds, the grievance goes to the grievance officer, who tenders a recommendation to the warden within two months after receipt of the written grievance, "when reasonably feasible under the circumstances." *Id.* at § 504.830(e). The warden then reviews the recommendation and provides the inmate with a written decision on the grievance. *Id.*

Alternatively, an inmate may request that a grievance be handled as an emergency by submitting the request directly to the warden. *Id.* at § 504.840. If the warden determines that "there is a substantial risk of imminent personal injury or other serious or irreparable harm to the [inmate]," then the grievance is processed on an expedited

---

[4] There are exceptions to this rule, none of which apply here. 20 ILL. ADMIN. CODE § 504.810(a), 504.870 (2017).

basis. *Id*. On the other hand, if the warden determines that the grievance does not involve an emergency, the inmate is notified in writing that he or she may resubmit the grievance through the normal grievance process. *Id*.

Regardless of whether the grievance was processed in the normal manner or as an emergency, if the inmate is unsatisfied with the warden's decision, he or she has thirty days from the date of the warden's decision to appeal to the Administrative Review Board ("ARB"). ILL. ADMIN. CODE, tit. 20, § 504.850(a). The ARB submits a written report of its findings and recommendations to the Director of the IDOC, who then makes a final decision "within six months . . . when reasonably feasible under the circumstances.". *Id*. at § 504.850(d), (e).

The Seventh Circuit requires strict adherence to the exhaustion requirement, *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006), however, an inmate is required to exhaust only those administrative remedies that are available to him. 42 U.S.C. § 1997e(a). Administrative remedies become "unavailable" when prison officials fail to respond to a properly filed inmate grievance or when prison employees thwart a prisoner from exhausting, *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir. 2002); *Dole*, 438 F.3d at 809.

## DISCUSSION

Defendants argue, in short, that Plaintiff did not file or fully exhaust any grievances related to his claims in this case, while Plaintiff contends that he was thwarted from using the grievance process.

To begin with, there is one fully exhausted grievance in the record: emergency grievance (#33-5-201) dated April 19, 2020 (Doc. 74-2, pp. 11–15). However, this grievance

was not fully exhausted until after Plaintiff filed this lawsuit. *Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020) ("By its plain terms, the PLRA requires prisoners to exhaust administrative remedies *before* filing suit; a 'sue first, exhaust later' approach is not acceptable.") (citation omitted) (emphasis in original). Furthermore, the issues raised in the grievance have no bearing on the claims proceeding in this lawsuit. Therefore, this grievance cannot serve to exhaust Plaintiff's claims in this case.

Defendants identified two other relevant grievances in the ARB's records: emergency grievance #377-10-19 dated October 30, 2019, and emergency grievance #327-1-20 dated January 21, 2020 (Doc. 59-1). Neither of these grievances were fully exhausted because, after they were deemed non-emergencies, they did not go back through the normal grievance process before Plaintiff sent them to the ARB. Plaintiff claims he attempted to resubmit them through the normal grievance process but each time they were returned to him by prison staff, who told him the grievances had already been ruled on and he had to send them to the ARB.

The Court finds that Plaintiff's story is not credible. Plaintiff testified unequivocally that he knew the grievance process. There is nothing in the Illinois Administrative Code that allows for an inmate to appeal to the ARB a warden's determination that a grievance is a non-emergency. The warden also responded to both of Plaintiff's grievances by telling Plaintiff he had to resubmit them "in the normal manner" (Doc. 59-1, pp. 3, 6). Additionally, Plaintiff's story did not have any of the standard indicia of credibility. He provided absolutely no details. For example, he did not give the names of the counselor or the officer(s) who purportedly tried to lead him

astray, or otherwise describe them. He also did not say how the grievances were returned to him (*e.g.*, in person, by mail, etc.) or how the message was delivered (*e.g.*, verbally during a face-to-face interaction, written on a memo, etc.). There is also nothing that corroborates his story. For example, when Plaintiff sent the grievances to the ARB, he made no attempt to tell the ARB that the facility was thwarting him from pursuing the normal grievance process. Plaintiff even included a letter to the ARB when he appealed his October 2019 grievance, but nowhere in the letter does Plaintiff state or even hint that the grievance officer refused to process his grievance (*see* Doc. 74-2, pp. 5–9). Accordingly, Plaintiff has failed to provide evidence sufficient to demonstrate the grievance process was rendered unavailable to him and the Court finds that he failed to exhaust the administrative remedies with respect to emergency grievance #377-10-19 dated October 30, 2019, and emergency grievance #327-1-20 dated January 21, 2020.

The Court must now ask whether there were other grievances aside from the three Defendants discussed, and whether Plaintiff was thwarted from fully exhausting them. According to Plaintiff, there were other grievances. He said he filed two grievances every time he received a ticket, and there were at least 12 tickets. He also claims that the warden ignored his emergency grievances and the grievance officer and the ARB ignored his grievances as well. In fact, Plaintiff claims he has never received a grievance back from the grievance officer or the ARB. He also claims that the ARB's records are falsified.

Plaintiff's testimony, however, was very general in nature. He never specifically identified any properly filed emergency grievances that the warden did not respond to. Likewise, he never specifically identified any grievances properly submitted through the

normal process that failed to come back from the counselor, grievance officer, or warden. And he never specifically identified any grievances properly submitted to the ARB that were ignored.

The Court accepts the reality that grievances sometimes go missing. But Plaintiff's version of this story is extreme. He claims that counselors, grievance officers, wardens, and ARB members all mishandled over a dozen grievances on proper grievance forms and another dozen grievances on looseleaf paper such that they all vanished without a single trace of them in any record. That story is simply not plausible on its face and Plaintiff did not provide evidence of any significance to support his story. The Court notes that while there is evidence of a number of grievances aside from the three identified by Defendants, there is nowhere near the number that Plaintiff claimed he submitted. Furthermore, there is no evidence that any of these grievances were fully exhausted before Plaintiff filed suit. First, there were two potentially relevant emergency grievances mentioned in the records (#279-11-19 dated November 22, 2019 and #64-5-20 dated April 29, 2020). These grievances were deemed non-emergencies and returned to Plaintiff, but nothing in the prison's records indicates that Plaintiff resubmitted the grievances through the normal procedure and Plaintiff did not provide any testimony specifically related to these grievances. Second, there were a handful of grievances pertaining to Plaintiff's tickets that were not on proper grievance forms. Notably, Plaintiff never testified that he was denied grievance forms. The most he said was that "it's very hard to get a grievance form in North 2 segregation." But he did not explain why. There is no evidence that he ever asked his counselor for grievance forms or complained he was

unable to obtain a grievance form. Plaintiff did not provide any testimony to that effect and there is no record of any complaints of this nature in his cumulative counseling summary (*see* Doc. 59-2).

Finally, the Court turns to Plaintiff's contention that the ARB's records were falsified. In support of this argument, he pointed out that the IGRV submitted by Defendants Schoenbeck, Jones, Gladney, and Dallas *does not* list grievance #33-5-20 (Doc. 59-1), but the IGRV previously submitted in another case *does* list grievance #33-5-20 (Doc. 63, pp. 2, 3–4, 17). *See Daniels v. Lawrence*, SDIL case no. 20-cv-96-DDWD, Doc. 96, pp. 9, 10–13. Plaintiff thus claims the IGRV submitted in the instant case is "not a correct copy of [his] grievance history" and "fraudulent" (Doc. 63, pp. 3–4). Plaintiff's argument is unconvincing. While it is unclear why grievance #33-5-20 does not appear on the IGRV submitted by Defendants Schoenbeck, Jones, Gladney, and Dallas, Plaintiff has provided nothing aside from his own speculation that it was because the ARB was actively falsifying its documents. The Court suspects the reason is something far more innocuous, such as the timing of the request for records from the ARB and/or the specifics of the request. At any rate, Defendant Wills obtained "updated" records from the ARB before submitting his motion for summary judgment and grievance #33-5-20 appears on the IGRV he submitted and was discussed in his briefing (Doc. 74, Doc. 74-2). The records submitted by Defendant Wills are the records relied on by the Court in deciding the motions for summary judgment. Consequently, the omission of grievance #33-5-20 from the briefing and evidence submitted by Defendants Schoenbeck, Jones, Gladney, and Dallas has no adverse impact whatsoever on the proceedings.

In conclusion, Plaintiff has failed to identify any credible evidence to demonstrate that he was thwarted in his efforts to exhaust his administrative remedies. Consequently, the Court concludes that the grievance process was not rendered unavailable to Plaintiff. Defendants are entitled to summary judgment on the issue of exhaustion and this case must be dismissed without prejudice. The dismissal, in turn, renders Plaintiff's motion for a preliminary injunction (Doc. 91) moot.

## CONCLUSION

The motions for summary judgment on the issue of exhaustion filed by Defendants Joshua Schoenbeck, Anthony Jones, Edwin Gladney, and Curtis Dallas (Doc. 58) and Anthony Wills (Doc. 73) are **GRANTED**. This case is dismissed with prejudice for failure to exhaust. Plaintiff's motion for a preliminary injunction (Doc. 91) is **MOOT**. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: September 8, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

## NOTICE

If Plaintiff wishes to contest this Order, he has two options. He can ask the Seventh Circuit to review the order, or he can first ask the undersigned to reconsider the Order before appealing to the Seventh Circuit.

If Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal *within 30 days* from the entry of judgment. FED. R. APP. P. 4(a)(1)(A). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard).

On the other hand, if Plaintiff wants to start with the undersigned, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The motion *must* be filed within twenty-eight (28) days of the entry of judgment, and the deadline *cannot* be extended. FED. R. CIV. P. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010); *Talano v. Nw. Med. Faculty Found., Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) ("To prevail on a Rule 59(e) motion to amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment.") (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and submitted on-time, the 30-day clock for filing a notice of appeal will be stopped. FED. R.APP. P. 4(a)(4). The clock will start anew once the undersigned rules on the Rule 59(e) motion. FED. R.APP. P. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). To be clear, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not stop the clock for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760–61 (7th Cir. 2001); *Martinez v. Trainor*, 556 F.2d 818, 819–20 (7th Cir. 1977). Again, the deadline for filing a notice of appeal can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.

The Court has one more bit of instruction regarding the appeals process. If Plaintiff chooses to appeal to the Seventh Circuit, he can do so by filing a notice of appeal in this Court. FED. R. APP. P. 3(a). The current cost of filing an appeal with the Seventh Circuit is $505.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If he is allowed to proceed IFP on appeal, he will be assessed an initial partial filing fee. 28 U.S.C. § 1915(b)(1). He will then be required to make monthly payments until the entire filing fee is paid. 28 U.S.C. § 1915(b)(2).